[Cite as *State v. Himes*, 2023-Ohio-3561.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-03-030 |
| | : | O P I N I O N |
| - vs - | | 10/2/2023 |
| | : | |
| ZOOEY FRANCES HIMES, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM FAIRFIELD MUNICIPAL COURT
Case No. 2022 CR B 02292


Kyle M. Rapier, City of Fairfield Prosecuting Attorney, for appellee.

Mark W. Raines, for appellant.


**M. POWELL, J.**

{¶ 1} Appellant, Zooey Himes, appeals her conviction in the Fairfield Municipal Court for domestic violence.

{¶ 2} Appellant was charged by complaint with domestic violence following an October 16, 2022 altercation between appellant and her live-in boyfriend, Cameron O'Brien, during which O'Brien punched appellant in the head and appellant dragged O'Brien by his

hair, hit him in the face, and choked him. Both parties suffered injuries as a result of the altercation. During the incident, O'Brien recorded a portion of the altercation on his cellphone. At the time of the incident, appellant and O'Brien were both on probation as a result of a prior domestic violence episode.

{¶ 3} On February 16, 2023, appellant entered a guilty plea to a reduced charge of criminal damaging. The trial court accepted appellant's guilty plea and proceeded to sentencing. During mitigation, appellant advised the trial court that "there is another side of the story," "there is a whole lot to this that's not being represented and I am taking the plea because I—there is so much—," and "I'm terrified to testify." Based upon these comments, the prosecutor expressed concerns appellant might later challenge the voluntariness of her guilty plea; the trial court stated, "I can't allow that to be on the record with a plea," and the matter proceeded to a bench trial. O'Brien and a police officer testified on behalf of the state. Appellant testified on her own behalf. O'Brien's videorecording was played at trial and admitted into evidence.

{¶ 4} Appellant and O'Brien presented two different versions of the incident. O'Brien testified that around 3:00 a.m. on October 16, 2022, he was contently working on an art project when appellant approached him and demanded that he go to bed. O'Brien told her to leave him alone; appellant started tugging his shoulder harder and harder. O'Brien told appellant to stop touching him several times; appellant kept touching him. Appellant then became upset, forcibly grabbed O'Brien's arm, and pulled him out of his chair into another room. Both were screaming. As O'Brien tried to leave the home, appellant pulled him inside, punched him in the head, pulled his hair, and choked him repeatedly. The portion of the altercation recorded on O'Brien's cellphone depicts appellant dragging O'Brien by his hair, hitting him in the face, and choking him, despite his pleas for her to stop. When O'Brien complained he could not breathe, appellant can be heard saying, "Good!"

During the videorecording, O'Brien never touches appellant. O'Brien denied touching, harming, or threatening appellant during the incident.

{¶ 5} On cross-examination, O'Brien authenticated several text messages he sent appellant in the afternoon of October 16, 2022, in which he told appellant he loved her, hoped to see her later, this was a last chance to make this work, to forget about last night, and inviting appellant to call him. Evidence also disclosed that O'Brien called appellant three times on the morning and afternoon following the incident.

{¶ 6} Appellant testified that she awoke at 2:45 a.m. on October 16, 2022. Upon realizing O'Brien was not in bed with her, she "sat in bed for a solid ten minutes debating" whether she should go back to sleep or try to locate O'Brien. Appellant found him sitting alone in another room in an agitated state. Appellant asserted that O'Brien has a cyclical pattern of behavior where he disassociates and becomes aggressive and violent, and that she can bring him back to reality through touch. Appellant started asking O'Brien what was going on and touched his hand. O'Brien asked her not to touch him. Appellant testified that she had two options at that point, either back away or try to calm him down through physical touch. As she tried to talk to O'Brien, he started cursing her. Appellant then tried to put her hand on his shoulder; O'Brien recoiled. Knowing that "something was going to escalate" if they were to stay in the home, appellant kept suggesting they go for a drive. O'Brien became verbally aggressive and loud, insulting and cursing her. The more appellant kept insisting they go for a ride, the more verbally aggressive O'Brien became.

{¶ 7} Appellant testified that once O'Brien realized she was neither backing down nor getting aggressive, O'Brien ran into their bedroom and sat on the bed; appellant followed him into the bedroom. Appellant once again asked that they go for a ride; O'Brien refused to leave and warned appellant that if she did not stop talking, he was "going to rage." Appellant stepped forward and leaned over, asking him, "why are you doing this?"

O'Brien once again started insulting appellant and then punched her in the forehead. Appellant told O'Brien to leave the home, then repeatedly asked him to sit on a chair to calm down, and finally demanded he leave the home. Appellant claimed she felt threatened by O'Brien who had been physical with her in the past.

{¶ 8} Appellant claimed that O'Brien's cellphone video was recorded after O'Brien had struck her in the face. Appellant admitted she was dragging O'Brien by the hair, denied choking or harming him, denied she was the sole aggressor in the video, and denied she was violent in the video, instead asserting she was trying to defend herself and disarm O'Brien.

{¶ 9} At the close of the bench trial, the trial court found appellant guilty of domestic violence, sentenced her to a suspended 180-day jail term, and placed her on a five-year community control term.

{¶ 10} Appellant now appeals, raising two assignments of error.

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE TRIAL COURT ERRED IN REFUSING TO GO FORWARD WITH THE APPELLANT'S GUILTY PLEA TO THE AMENDED CHARGE OF CRIMINAL DAMAGING AFTER APPELLANT HAD PLED GUILTY, GAVE A COMPLETE ADMISSION TO THE FACTS, AND THE COURT PROCEEDED TO SENTENCING WITH APPELLANT OFFERING MITIGATION ON HER BEHALF.

{¶ 13} Appellant argues the trial court abused its discretion when it rescinded appellant's guilty plea and forced her to go to trial. Notwithstanding the parties' briefed arguments, the issue in this case does not concern enforcement of the terms of the plea agreement but whether the trial court had the authority to refuse to accept appellant's guilty plea and proceed with a trial.

{¶ 14} Appellant pled guilty to misdemeanor criminal damaging in violation of

Fairfield Municipal Ordinance 541.03(a)(1). Crim.R. 2(D) defines "petty offense" as "a misdemeanor other than a serious offense." "Serious offense" includes "any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Crim.R. 2(C). Under the facts of this case, whether the criminal damaging was a misdemeanor of the first or second degree under Fairfield Municipal Ordinance 541.03(b), the offense was a petty offense based upon the maximum potential jail term that could be imposed. *See* Fairfield Municipal Ordinance 501.99(b)(1)(A) (for a first-degree misdemeanor, jail term may not be more than 180 days), and 501.99(b)(1)(B) (for a second-degree misdemeanor, jail term may not be more than 90 days).

{¶ 15} Because the criminal damaging offense carried a maximum jail term of six months or less and was therefore a petty offense, Crim.R. 11(E) applies and provides, "In misdemeanor cases involving petty offenses[,] the court may refuse to accept a plea of guilty or no contest, and shall not accept such plea without first informing the defendant of the effect of the pleas of guilty, no contest, and not guilty." Pursuant to the plain language of Crim.R. 11(E), the trial court was not required to accept appellant's guilty plea.

{¶ 16} The fact the proceedings had moved to the sentencing phase is of no consequence because the trial court acted to refuse appellant's guilty plea prior to the imposition of a sentence and the journalization of a sentencing entry. There is no final order in a criminal case until a sentencing entry has been journalized. *See State v. Beckett*, 12th Dist. Brown Nos. CA2020-08-006 and CA2020-08-007, 2021-Ohio-1687. "[A] judgment of conviction is a final order subject to appeal under R.C. 2505.02 when the judgment entry sets forth (1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, ¶ 14. Because a sentencing entry had not been journalized, the trial court retained jurisdiction to refuse appellant's guilty plea pursuant to Crim.R. 11(E).

{¶ 17} Appellant's first assignment of error is overruled.

{¶ 18} Assignment of Error No. 2:

{¶ 19} THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE APPELLANT ACTED IN SELF-DEFENSE.

{¶ 20} Appellant argues her domestic violence conviction is against the manifest weight of the evidence because the state failed to disprove she acted in self-defense. In support of her argument, appellant underlines the fact that O'Brien had punched her in the forehead minutes before she attempted to expel him from her home and that she felt threatened by O'Brien given his state of mind during the incident.

{¶ 21} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Clemmons*, 12th Dist. Butler No. CA2020-01-004, 2020-Ohio-5394, ¶ 15. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*

{¶ 22} Questions regarding witness credibility and weight of the evidence are primarily matters for the trier of fact to decide because the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence. *Id.* at ¶ 16. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52.

{¶ 23} Appellant was convicted of domestic violence in violation of Fairfield Municipal

Ordinance 537.14(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." "Physical harm to persons" means "any injury, illness or other physiological impairment, regardless of its gravity or duration." Fairfield Municipal Ordinance 501.01(c).

{¶ 24} In addition to the elements of domestic violence set forth above, the state also had the burden of proving beyond a reasonable doubt that appellant did not act in self-defense. *See* R.C. 2901.05(B)(1) (effective March 28, 2019). In a case involving the use of nondeadly force, an accused is justified in using force against another if (1) she was not at fault in creating the situation giving rise to the altercation and (2) she had reasonable grounds to believe and an honest belief, even though mistaken, that she was in imminent danger of bodily harm and her only means to protect herself from the danger was by the use of force not likely to cause death or great bodily harm. *Clemmons*, 2020-Ohio-5394 at ¶ 22. Pursuant to amended R.C. 2901.05, the state only had to "disprove one of the elements of self-defense beyond a reasonable doubt." *Id.*

{¶ 25} After thoroughly reviewing the record, we find that the trial court did not lose its way and create a manifest miscarriage of justice in finding appellant guilty of domestic violence. "[T]he first element of a self-defense claim does not require in all situations that the [defendant] must have refrained from throwing the first punch" or a showing that the defendant played no part in creating the situation giving rise to the affray. *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 Ohio App. LEXIS 329, *9 (Jan. 22, 2002); *State v. Gillespie*, 172 Ohio App.3d 304, 2007-Ohio-3439, ¶ 17 (2d Dist.). Rather, the first element of a self-defense claim provides that the defendant must not be at fault in creating the situation that gave rise to the affray. *State v. Elam*, 12th Dist. Butler No. CA2021-08-106,

2022-Ohio-1895, ¶ 14. This concept is broader than simply not being the immediate aggressor. *Id.* A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense. *Id.; Nichols* at *7.

{¶ 26} Even if, under appellant's version, O'Brien threw the first punch, the greater amount of credible evidence offered at trial established beyond a reasonable doubt that appellant was at fault in creating the situation. By her own admission, appellant initiated the encounter after she realized O'Brien was not in bed and deliberating "for a solid ten minutes" whether she should simply go back to sleep. Appellant sought out and located O'Brien, who was working on an art project and was in an agitated state, and engaged with him. Despite observing and recognizing an escalation in O'Brien's demeanor, despite his requests that she neither touch him nor speak to him, despite his attempt to get away from appellant and his subsequent warning he was "going to rage," appellant kept engaging with and touching O'Brien, and ultimately dragged him by his hair, hit him in the face, and choked him. Ohio courts have long recognized that a defendant is at fault in creating the situation giving rise to the affray when the defendant chooses to confront the victim or knowingly go to a place where the victim will be, even when the defendant's action was otherwise completely lawful. *Elam* at ¶ 15.

{¶ 27} The trial court was presented with conflicting versions of events by appellant and O'Brien. However, as the trier of fact, the trial court was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations to judge the credibility of witnesses and the weight to be given the evidence. *Clemmons*, 2020-Ohio-5394 at ¶ 24. While conflicting evidence was presented at trial, appellant's conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence presented by the state. *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17.

{¶ 28} Accordingly, as the state proved beyond a reasonable doubt that appellant created the situation giving rise to the altercation and knowingly caused physical harm to O'Brien by dragging him by his hair, kicking him in the face, and choking him, we find that appellant's domestic violence conviction is not against the manifest weight of the evidence.

{¶ 29} Appellant's second assignment of error is overruled.

{¶ 30} Judgment affirmed.

S. POWELL, P.J., and BYRNE, J., concur.